## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEANNA LEWAKOWSKI, on behalf of herself and all others similarly situated, | **CASE NO.: 1:21-cv-03276** |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| UNILEVER UNITED STATES, INC., and CONOPCO, INC. d/b/a UNILEVER HOME & PERSONAL CARE USA, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Deanna Lewakowski ("**Plaintiff**"), on behalf of herself and all others similarly situated, brings this class action against Defendants, Unilever United States, Inc. ("Unilever U.S."), and Conopco, Inc. d/b/a Unilever Home & Personal Care USA ("Conopco") (collectively, "Unilever" or "**Defendants**"), and alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

## NATURE OF THE CASE

1. This is a nationwide class action brought by Plaintiff on behalf of herself and other similarly situated consumers who purchased variations of Suave Professionals Shampoo and/or Conditioner that contain the ingredient DMDM hydantoin (collectively, the "**Products**" or "**Suave Products**") for personal or household use and not for resale ("**Class**" or "**Class Members**"). As alleged herein, Defendants made material misrepresentations and omissions regarding the Products. By purchasing the mislabeled and misrepresented Products, Plaintiffs seek monetary

damages for themselves and on behalf of the Class.[1]

2.      Defendants design, formulate, produce, manufacture, sell, and distribute Suave Products throughout the United States. The Products are sold through third-party mass market retailers both online and in brick-and-mortar stores.

3.      Suave Products are marketed as working just "as well as premium brands," and ask consumers to "trust [they]'ve got the good stuff."[2]

4.      Though their uniform, widespread, nationwide advertising campaign, Defendants have led consumers to believe that Suave Products help "nourish" and "replenish" hair and specifically help to reduce hair loss.

5.      In reality, the Products all contained DMDM hydantoin, an ingredient known human carcinogen – for absorption into the scalp during every use/exposure.

6.      California recently banned the use of formaldehyde in beauty products. Maryland passed a similar law. Regulations to implement the laws in both states will begin in 2025.

7.      Nowhere on the package labeling or on Unilever's websites or other marketing materials did Defendants warn or represent to Plaintiff and members of the Class that they were at risk of repeated formaldehyde exposure upon proper application of the Products. Accordingly, Defendants misled and deceived the public, and placed their customers in harm's way, all for the sake of increased profits.

8.      Defendants knew but failed to disclose to Plaintiff and the Class that they would be repeatedly exposed to formaldehyde due to the inclusion of DMDM hydantoin in the Products.

9.      Defendants failed to properly warn consumers of the risks and dangers attendant to

---

[1] Plaintiff does not bring any claims for personal injuries.
[2] https://www.suave.com/us/en/about.html (last accessed May 27, 2022)

2

the use of the Products – namely, being repeatedly exposed to formaldehyde, a known human toxicant – even well after Defendants knew or should have known of the Products' ingredients and inherent risks. Defendants continued to conceal the dangers of the Products by failing to recall the Products, and otherwise claiming they are safe when properly applied.

10. For many years, Defendants have continued to use DMDM hydantoin in the Products despite their actual knowledge that the ingredient releases formaldehyde, and in direct contradiction to their misrepresentations that the Products are safe and healthy for use as shampoos and conditioners by consumers.

11. Indeed, Defendants chose to focus on promoting the Products as safe – having the ability to safely nourish, cleanse, smooth and repair hair in order for consumers to obtain smooth, shiny, manageable hair with no frizz -- to justify a premium price. These are material facts to all reasonable consumers, including Plaintiff and the Class.

12. Furthermore, reasonable consumers, including Plaintiff, who purchased the Products and used the Products as intended frequently would consider the mere presence (or risk) of formaldehyde, no matter the amount, a material fact when considering whether to purchase the Products.

13. As a result of Defendants' misrepresentations and omissions, Plaintiff and the Class were all unknowingly and repeatedly exposed to formaldehyde, and they have suffered actual monetary damages by purchasing Products that contain a formaldehyde releasing ingredient.

14. The misrepresentations and omissions allowed Defendants to capitalize on, and reap enormous profits from, reasonable consumers who paid a premium price for Products that omitted material information as to the Products' true quality and value.

15. Given the massive quantities of the Products sold all over the country, this class

3

action is the proper vehicle for addressing Defendants' misconduct and for attaining needed monetary relief for those affected.

## FACTUAL ALLEGATIONS

*Unilever's Business*

16.     Established over 100 years ago, Unilever is one of the world's largest consumer goods companies. Their more than 400 household name brands are sold in over 190 countries and include various cosmetic and personal care brands.[3]

17.     In 2010, Unilever acquired U.S.-based Alberto Culver Company for US $3.7 billion. The Alberto Culver acquisition included many large beauty brands, including haircare brand TRESemmé. At the time of the announcement, Unilever claimed that the "acquisition [made] Unilever the world's leading company in hair conditioning, the second largest in shampoo and the third largest in styling…"[4]

18.     The global haircare market was worth $85.5 billion dollars in 2017 and is expected to exceed $102 billion dollars by 2024.[5]

19.     Currently, Unilever's business consists of:

        a.     400+ Unilever brands used worldwide;

        b.     2.5 billion users of the products daily;

        c.     190 countries where brands are sold; and

        d.     €52 billion turnover in 2019.

---

[3] https://www.unilever.com/our-company/at-a-glance/ (last accessed May 27, 2022).
[4] https://www.businesswire.com/news/home/20110506005999/en/Unilever-Receives-Approval-to-Acquire-Alberto-Culver (Last Accessed May 27, 2022).
[5] https://www.statista.com/topics/4552/hair-care-product-market-in-the-us/ (last accessed May 27, 2022).

20.     In 1996, Unilever acquired US-based Helene Curtis Industries, Inc. for US $770 million. The Helene Curtis acquisition included many large beauty brands, including Suave, Degree, Salon Selectives, and Finesse.[6]

21.     Unilever represents itself and its brands as having "a global footprint" and "a belief in doing things the right way."[7]

22.     Unilever sells and distributes Suave products in more than a dozen countries, including the US, and represents that Suave is a haircare brand that "brings salon-quality hair care to the hands of the general public."[8]

23.     As part of its Suave brand, Unilever sells the Suave "Professionals" Products at issue here.

24.     In 2019, Unilever had a more than 17% share of the U.S. haircare market.[9] As its Chief Financial Officer Graeme Pitkethly recognized, "There's been a very vibrant and competitive battle in hair care in North America."[10]

25.     Shampoo products offer healthy profit margins and opportunities for companies to innovate by adding minor ingredients.[11]

26.     In order to entice customers to purchase the Suave Products, Defendants advertise the Suave Products as having smoothing, repairing, or restoring benefits.

---

[6] https://www.nytimes.com/1996/02/15/business/unilever-agrees-to-buy-helene-curtis.html (Last Accessed May 27, 2022).
[7] https://www.unilever.com/our-company/at-a-glance/ (last accessed May 27, 2022).
[8] https://www.suave.com/us/en/about.html (Last Accessed May 27, 2022).
[9] https://www.wsj.com/articles/unilever-cuts-prices-as-shampoo-rivalry-grows-11571302051 (last accessed May 27, 2022).
[10] *Id.*
[11] *Id.*

*Formaldehyde Donors and DMDM Hydantoin*

27.     Nearly all shampoo products contain preservatives. This is because cosmetics and personal care items containing water in their formulations, such as shampoo, are subject to spoilage and microbial growth. Preservatives inhibit that bacterial growth and extend shelf life.[12]

28.     There are a variety of synthetic and natural preservatives which may be used in cosmetics that are safer alternatives to DMDM hydantoin as they do not release formaldehyde.

29.     Formaldehyde donors, also known as formaldehyde releasing preservatives ("FRPs"), are one form of preservative used in cosmetic products.

30.     Formaldehyde is a colorless, flammable, strong-smelling chemical that is commonly used as an industrial fungicide, germicide, and disinfectant, as well as a preservative in mortuaries and medical laboratories.[13]

31.     Formaldehyde donors continuously release small amounts of formaldehyde, which in turn prevents microbial growth in products such as cosmetics.[14] The reactions that generate formaldehyde occur as the products sit on shelves in stores or bathroom cabinets;[15] there is nothing a consumer can do to mitigate the release of formaldehyde in products containing formaldehyde donors.

32.     Formaldehyde donors are known to slowly leach formaldehyde after coming into contact with water.

---

[12] https://www.theecowell.com/blog/preservatives1 (last accessed June 3, 2021).
[13] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet (last accessed June 2, 2021).
[14] https://davidsuzuki.org/queen-of-green/dirty-dozen-formaldehyde-releasing-preservatives/ (last accessed June 2, 2021).
[15] https://www.ewg.org/research/exposing-cosmetics-cover-up#formaldehyde (last accessed May 27, 2021).

33. Formaldehyde donors can be absorbed through the skin and have been linked to cancer and allergic skin reactions.[16]

34. Formaldehyde is a known human carcinogen, as recognized by the United States National Toxicology Program and the International Agency for Research on Cancer.

35. DMDM hydantoin is one of most popular formaldehyde donors, and has been used as a preservative in Unilever products, including the Suave Products, for more than a decade.

36. In 1984, DMDM hydantoin ranked 9th in the list of the most frequently used cosmetic preservatives in the USA.[17] By 1987, DMDM hydantoin was included in approximately 115 product formulas filed with the FDA, most frequently in shampoos.[18]

37. The FDA does not restrict the amount of formaldehyde that can be present in cosmetics in the U.S., and DMDM hydantoin may be used at concentrations up to 1%. By contrast, the European Union has banned more than 0.2 percent formaldehyde in personal care products due to concerns about the dangers associated with exposure.[19]

38. Since at least the 1970's, studies and patch tests were being performed to determine human reactivity to DMDM hydantoin,[20] including specifically the "relationship between contact

---

[16] https://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (last accessed May 27, 2022).

[17] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).

[18] *Id.*

[19] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (*Contact Dermatitis*, 1988, 18:197-201); https://www.ewg.org/research/exposing-cosmetics-cover#formaldehyde (Last Accessed May 27, 2022).

[20] Tudela E, MacPherson C, Maibach HI. Long-term trend in patch test reactions: a 32-year statistical overview (1970-2002), part II. Cutan Ocul Toxicol. 2008;27(3):187-202. doi: 10.1080/15569520802143436. PMID: 18988088.

allergy to formaldehyde," including "reactions to DMDM hydantoin."[21]

39.     One study performed in 1987 specifically examined whether the presence of DMDM hydantoin in cosmetics could cause adverse effects in patients pre-sensitized to formaldehyde.[22] The conclusion even more than twenty years ago was that when used in concentrations comparable to those in cosmetic products, DMDM hydantoin contained enough free formaldehyde to cause dermatitis, or skin irritation.[23] Based on the study's findings, the authors suggested that cosmetic products with FRPs should have warnings that the products "'contain formaldehyde'… whether present as free formaldehyde or bound by a donor."[24]

40.     The prevalence of dermatitis caused by DMDM hydantoin is well documented. The U.S. Food & Drug Administration considers DMDM hydantoin one of the top allergens "that cause the most allergic reactions from the use of cosmetic products."[25] Further, the North American Contact Dermatitis Group ("NACDG") Standard Series, a screening method for diagnosing a skin contact allergy, listed DMDM hydantoin as the 21st most common allergen in the 2005-2006.[26]

41.     Further, a study in 2010 concluded that individuals could experience allergic reactions to not only the formaldehyde released by formaldehyde donors, but the formaldehyde donors themselves—including DMDM hydantoin, which was found to be "reactive per se."[27]

---

[21] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (last accessed May 27, 2022).
[26] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195 (citing Rietschel RL, Fowler JF., Jr . Fisher's Contact Dermatitis. 5th ed. Philadelphia: Lippincott Williams & Wilkins; 2001).
[27] Kireche M, Gimenez-Arnau E, Lepoittevin JP. Preservatives in cosmetics: reactivity of allergenic formaldehyde-releasers towards amino acids through breakdown products other than formaldehyde.

42.     DMDM hydantoin causes reactions when the immune system is triggered to release chemical substances such as antibodies, resulting in reactions including itchiness, red rashes on the skin, or more extreme reactions.[28]

43.     One study published in 2011 estimated that the frequency of allergic contact dermatitis to formaldehyde and formaldehyde donors in the United States population was 8-9%, which is more than triple the frequency in Europe.[29]

44.     Dermatitis on the scalp has been linked to hair brittleness and hair loss. Specifically,

[A number of observations have found that premature hair loss may be caused by the poor scalp health associated with either dandruff and seborrheic dermatitis, or psoriasis, indicating that the effect on the preemergent hair fiber may alter the anchoring force of the fiber with the follicle, as evidenced by an increased proportion both of catagen and telogen, and of dysplastic anagen hairs (anagen hairs devoid of hair root sheaths) in the trichogram (hair pluck).[30]

***The Suave Products***

45.     Through its labeling and an extensive marketing campaign, including through its website and online advertisements, Defendants made a number of misrepresentations about the Products at issue: that the Products contain formulas intended to smooth hair, add softness and shine, and/or prevent frizzing; and that the Products provide "lasting smoothness," "gently cleanse," "vibrant and shiny hair", and/or "reduce hair fall."

46.     However, the Products' formula contains an ingredient, or combination of

---

Contact Dermatitis. 2010 Oct;63(4):192-202. doi: 10.1111/j.1600-0536.2010.01770.x. Epub 2010 Aug 20. PMID: 20731691.
[28] https://www.fda.gov/cosmetics/cosmetic-ingredients/allergens-cosmetics (last accessed May 27, 2022).

[30] Trueb, Ralph M., Henry, Jim P., Davis, Mike G., and Schwartz, Jim R., Scalp Condition Impacts Hair Growth and Retention via Oxidative Stress, Int J Trichology. 2018 Nov-Dec; 10(6): 262–270, doi: 10.4103/ijt.ijt_57_18.

ingredients, that has caused Plaintiff and thousands of consumers to experience hair loss and/or scalp irritation. Moreover, Defendants specifically do not use DMDM hydantoin in other Suave products lines such as Suave Essentials. Defendants seemingly only used DMDM hydantoin in their "Professionals" line of products, which generally cost more than its other products.[31]

47.    DMDM hydantoin is found in the Products as stated on the Products' back labels for at least the following Suave Professionals Products, and possibly others:

- Professionals Biotin Infusion Strengthening Shampoo
- Professionals Coconut Oil Infusion Damage Repair Shampoo
- Professionals Keratin Infusion Color Care Shampoo
- Professionals Keratin Infusion Smoothing Shampoo & Conditioner
- Professionals Natural (Macadamia Oil) Infusion Shampoo & Conditioner
- Professionals Honey Infusion Shampoo
- Professionals Moroccan (Argan Oil) Infusion Shampoo
- Professionals Vitamin Infusion Shampoo
- Professionals Ultra Sleek & Smooth Shampoo & Conditioner
- Professionals Anti-Dandruff 2-in-1Shampoo & Conditioner
- Professionals 2-in-1 Plus Shampoo & Conditioner
- Professionals Black Raspberry & White Tea Shampoo & Conditioner
- Professionals Rosemary and Mint Shampoo
- Professionals Almond and Shea Butter Shampoo & Conditioner
- Professionals Sea Mineral Infusion Shampoo & Conditioner
- Professionals Deep Moisture Replenish Shampoo & Conditioner

---

[31] *Compare* "Suave Professionals Smoothing Shampoo For Frizz Control Ultra Sleek and Smooth", priced at $4.99 for 28fl oz. at an authorized retailer (https://www.walgreens.com/store/c/suave-sleek-shampoo-sleek/ID=prod6013750-product) with "Suave Essentials Daily Clarifying Shampoo with Aloe" priced at $1.94 for 30 fl. Oz. at a similar authorized retailer. (https://www.walmart.com/ip/Suave-Essentials-Clarifying-Moisturizing-Daily-Shampoo-with-Aloe-30-fl-oz/50894093?athbdg=L1200). Note: since the original Complaint was filed in June 2021, Plaintiff Lewakowski's purchased product, "Suave Professional Smoothing Shampoo For Frizz Control Ultra Sleek and Smooth," is much harder to find in stores and appears only to be available at 1) some brick-and-mortar retail stores for higher prices than last year, *despite* the fact that the "Suave Essentials" comparison product is about the same price, or 2) online through web-based third-party retailers. Plaintiff Lewakowski's product no longer appears on Defendants' website in their listings of "Suave" products.

48.     The Products are marketed in large bold font on the Products' front labels, such as in the products below labeled as "Professionals", signifying their equivalence with "salon proven" products:



49.     Defendants made a number of misrepresentations and express warranties: that the Products contain a formula intended to smooth hair or function as a "smoothing" product.

50.     Defendants manufacture, advertise, market, and distribute and sell the Suave Products throughout the United States, including in Illinois.

11

51.    However, at all times relevant to this action, the Products' formula contained an ingredient, or combination of ingredients, that repeatedly exposed Plaintiff and thousands of consumers to formaldehyde without their knowledge.

52.    DMDM hydantoin was found in the Products as stated on the Products' back labels. Examples of back labels as reproduced on authorized retailers' websites are seen below:



***Unilever's Knowledge***

53.    ***For at least a decade***, Unilever has had actual knowledge that DMDM hydantoin would lead to repeated formaldehyde exposure when used as a preservative in hair products.[32]

54.    DMDM hydantoin, along with other ingredients, were the subject of prior litigation initiated against Unilever in 2012. The lawsuit involved formaldehyde exposure related to its Suave Professionals Keratin Infusion products.[33]    The Suave Professionals Keratin products were ultimately recalled based on reports of adverse reactions to formaldehyde exposure, in addition to

---

[33] *Reid, et al. v. Unilever United States, Inc., et al.*, C.A.N. 1:12-cv-06058 (N.D. Ill.).

the fact that they had been advertised as formaldehyde-free despite containing DMDM hydantoin. The $10.2 million settlement in the case was upheld by the Seventh Circuit Court of Appeals in 2016.

55.    In part, the lawsuit involved the allegations that,

> "... despite the express representation that the Treatment contains no Formaldehyde, the Treatment does contain DMDM Hydantoin, a chemical that is known as a "Formaldehyde-releaser." *See* http://www.safecosmetics.org/article.php?id=599. Formaldehyde releasers are sometimes used in cosmetics in place of formaldehyde and release small amounts of Formaldehyde over time. Formaldehyde is a known human carcinogen."[34]

56.    Like Unilever's Suave Products at issue here, the Suave products at issue in *Reid* were exposing consumers to formaldehyde during every use.

57.    Additionally, beginning in 2012, other manufacturers within the industry had begun to eliminate formaldehyde and/or formaldehyde donors them from their products. For example, beauty product manufacturer Johnson & Johnson announced in 2012 that it would "remove a host of potentially harmful chemicals, *like formaldehyde*, from its line of consumer products by the end of 2015."[35] [Emphasis Added].

58.    Despite having constructive knowledge and actual knowledge since at least 2012 that DMDM hydantoin use in the Products repeatedly exposed consumers to formaldehyde, Unilever continued to include this ingredient as a preservative in its Suave Professionals products, even going so far as to represent to the public that the preservatives used are carefully chosen and safe for use.[36]

59.    In fact, Unilever made the following specific statement about preservatives used in its formulations, which would have necessarily included DMDM hydantoin:

---

[34] *Reid, et al. v. Unilever United States, Inc., et al.,* 1:12-cv-06058 (N.D. Ill.), Dkt. No. 1, ¶ 23.

[35] https://www.nytimes.com/2012/08/16/business/johnson-johnson-to-remove-formaldehyde-from-products.html (last accessed May 27, 2022).

> We use preservatives to keep home and personal care products in good condition: without them, they could be spoiled by bacteria, yeasts and molds. We choose our preservative ingredients carefully, making sure they are safe and effective for people who use our products.[37]

60.     As Defendants are aware, there is a litany of alternative preservatives that can be used in shampoos, conditioners, and cosmetics that do not release known human carcinogens and are non-synthetic, including:

    a.   Glyoxylic acid (or derivatives thereof);

    b.   Potassium sorbate and sorbic acid;

    c.   Citric acid and its salts;

    d.   Rosemary oil extract;

    e.   Neem oil extract;

    f.   Lavender oil;

    g.   Grapefruit seed extract;

    h.   Vinegars; and

    i.   Others.

61.     Despite its representations that the "carefully chosen" DMDM hydantoin is safe for use by consumers, Defendants failed to properly warn consumers that use of their Products would repeatedly exposure consumers to formaldehyde – even well after Defendants knew or should have known of the Products' hazards and risks. Defendants continued to conceal the dangers of the Products by failing to appropriately and fully recall the Products, by continuing to claim the

---

[37] https://www.unilever.com/brands/Our-products-and-ingredients/Your-ingredient-questions-answered/index.html (last accessed May 27, 2022).

Products were safe when properly applied, and by failing to warn consumers of the danger attendant to use of the Products.

62.     Nowhere on the package labeling or on Defendants' websites or other marketing materials did Defendants warn Plaintiff and members of the Class that they were at risk of repeated formaldehyde exposure upon proper application of the Products. Even Defendants' "Formaldehyde donors" page fails to recognize any associated risk of reaction to DMDM hydantoin.[38]

63.     Defendants refused to properly inform their consumers, including Plaintiffs and the Class, about the inherent danger of the Products' ingredients, and in doing so, they deprived Plaintiffs and the Class with the opportunity to choose whether they wanted to purchase a shampoo that led to repeated exposure to formaldehyde.

64.     Defendants misled and deceived the public, and placed their customers in harm's way, all for the sake of increased profits.

65.     Defendants' uniform acts and omissions in connection with the development, marketing, sale and delivery of the Products violate the consumer protection laws of Illinois and the other states alleged herein and unjustly enrich Defendants.

66.     Although Defendants have, or should have been aware, of the formaldehyde exposure caused by one or more of the ingredients in the Suave Products, they have failed and continue to fail to warn consumers about the inherent formaldehyde exposure. Instead, Defendants labeled, advertised, promoted, and sold the Products targeting consumers who wanted to *safely* smooth, shine, and manage their hair with no frizz.

67.     U.S. consumers, including Plaintiff and Class Members, reasonably expect that

---

[38] https://www.unilever.com/brands/whats-in-our-products/your-ingredient-questions-answered/formaldehyde-donors/  (last accessed May 27, 2022).

their hair care products—especially those marketed as safe, healthy and nourishing-- will not lead to repeated formaldehyde exposure as the result of defective design and manufacturing or because of inadequate research or due diligence. Indeed, U.S. consumers, including Plaintiff and Class Members, had no expectation that the Products would lead to repeated formaldehyde exposure.

68.     Further, consumers reasonably expected that if Unilever, the company primarily responsible for developing, manufacturing, marketing and distributing the Products, knew that the Products would cause repeated formaldehyde exposure (whether by proper application or by misapplication), then Unilever would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem.

69.     By downplaying, concealing and misrepresenting the Products and the safety and risks of their use, Unilever failed in its duty to provide consumers with adequate information, and continued even knowing of the Products' dangers to create and perpetuate a false public perception that there was little or no risk of harm from the use of its Products.

70.     Moreover, as set out more fully herein, Defendants' efforts to conceal and downplay the hundreds if not thousands of complaints of Class Members who actually complained of adverse reactions from repeated formaldehyde exposure from using the Products as intended, comprised a pointed attack on consumers.

64.     Unilever further represented through its website that, *inter alia*, its formaldehyde donors, including DMDM hydantoin, "are used in personal care products as safe and efficient preservatives."[39] It further represents that "Product safety is our top priority… People trust us to

---

[39] https://www.unilever.com/brands/our-products-and-ingredients/your-ingredient-questions-answered/formaldehyde-donors.html (Last Accessed May 27, 2022).

provide them with products that are safe for them, their families and the environment,"[40] and that its "expert scientists use state of the art methods to ensure [Unilever] use[es] ingredients at the minimum level required to be effective, without causing people to become allergic."[41]

65.    However, Unilever knew, but failed to disclose to Plaintiff and the Class, any potential dangers from repeated formaldehyde exposure caused by one or more ingredients in the Products, including the ingredient DMDM hydantoin.

71.    Defendants failed to properly warn consumers of the risks and dangers attendant to the use of their Products – namely, repeated exposure to formaldehyde – even well after Defendants knew or should have known of the nature of their Products' ingredients. Defendants continued to conceal the dangers of the Products by failing to recall the Products, and otherwise claim they are safe when properly applied.

***Consumer Complaints***

72.    Since at least 2013, Unilever became aware through hundreds of consumer complaints and anecdotes on various retail websites that some consumers believed that they were suffering adverse reactions that are often associated with repeated formaldehyde exposure from their use of Suave Products.

73.    Despite the direct and constructive knowledge that Unilever had from scientific studies, as well as hundreds of online consumer complaints and anecdotes, Unilever willfully chose to continue to deceive consumers regarding the true nature of the products when they had substantial

---

[40]  Since the filing of the original Complaint, Unilever has changed the  content of its website to remove this language. It was previously available at this website: https://www.unilever.com/brands/our-products-and-ingredients/Our-approach-to-the-safety-of-products-and-ingredients/ (Last Accessed June 15, 2021).
[41] Since the filing of the Consolidated Amended Complaint, Unilever has changed the  content of their website to remove this language. It was previously available at this website: https://www.unilever.com/brands/our-products-and-ingredients/ (Last Accessed June 15, 2021).

evidence suggesting that the Products were causing repeated formaldehyde exposure and potentially other adverse effects.

### Defendants' Warranties

66.     As a result of Defendants' misconduct and misrepresentations, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

67.     Plaintiff brings this suit to halt the unlawful sales and marketing of the Suave Professionals Products by Defendants and for damages she sustained as a result. Given the massive quantities of the Products sold all over the country, this class action is the proper vehicle for addressing Defendants' misconduct and for attaining needed relief for those affected.

### Defendants' Misrepresentations Regarding the Products

68.     Unilever released at least some of the Suave Professionals Products more than seven years ago. The Products were sold by Unilever directly and through retail shops to consumers nationwide, including in Illinois.

69.     The Products state, on the front and/or back of the bottles' labels, that the Products are formulated with lush "natural" oils and other "infusions" that provide smoothing benefits, including "anti-frizz", "shine", "softness", "healthy", and "moisturized" hair.

70.     By promoting the Products as "Salon Proven" or "Salon-quality", Unilever warranted the Products as safe, non-toxic hair smoothing solutions with ingredients that could be purchased at a fraction of the price of a salon treatment.

71.     Plaintiff and the Class did not and would not expect that application of the Products would cause repeated exposure to formaldehyde upon proper application.

72.     Plaintiff and the Class reasonably expected a warning regarding any potential risks and hazards to consumers, especially because the Food, Drug and Cosmetic Act regulations

provide that cosmetics that may be hazardous to consumers must bear appropriate warnings. [42]

73.     The Food and Drug Administration has written about the risks of formaldehyde and formaldehyde donors (like DMDM Hydantoin) in hair care and actively discourages home purchase of hair smoothing products such as Defendants' Products.[43]

74.     Contrary to the Food, Drug and Cosmetic Act regulations, the Products also failed to provide adequate directions for safe use, although Defendants knew or should have known the Products would be unsafe even when used as intended. In fact, Unilever's website affirmatively represents that it complies with all applicable labeling laws. *See* Unilever's Code of Business Principles and Code Policies, at 6.[44]

75.     There are at least hundreds of posts on various retail websites highlighting the "horror stories" of women and men who used the Products. These posts are strikingly similar to Plaintiff's experiences. Consumers describe how they were misled by Unilever's representations about the Products, expecting salon-quality, smoothing shampoo whose effects would (1) result with noticeably smooth, manageable hair that keeps frizz to a minimum, and (2) nourish each strand to leave hair silky, shiny, moisturized, and repaired, but instead received a toxic Product that caused repeated formaldehyde exposure.

74.     Unilever continued to advise consumers that these Products are safe to use as directed, without providing any disclosure concerning the complaints of repeated formaldehyde exposure and with no warnings that repeated formaldehyde exposure would result from their use.

---

[42] *See* https://www.fda.gov/cosmetics/cosmetics-labeling-regulations/summary-cosmetics-labeling-requirements (last accessed May 27, 2022).

[43] https://www.fda.gov/consumers/consumer-updates/formaldehyde-hair-smoothing-products-what-you-should-know?utm_medium=email&utm_source=govdelivery (last accessed May 27, 2022).

[44] *See* https://www.unilever.com/Images/code-of-business-principles-and-code-policies_tcm244-409220_en.pdf. (noting "Unilever companies and employees are required to comply with the laws and regulations of the countries in which we operate.") (last accessed on May 27, 2022).

Indeed, despite Unilever's knowledge and awareness of hundreds if not thousands of complaints of adverse reactions from repeated formaldehyde exposure caused by the Products, Unilever continued to claim the use of DMDM hydantoin it is safe and permitted them to be sold— without providing consumers with *any* revised warnings or disclosures.

76. The Products are marketed as providing various benefits and "infusions", and are sold at retail stores such as CVS, Target, Walgreens, and Walmart, and through e-commerce websites such as Amazon.com, CVS.com, Target.com, Walgreens.com, and Walmart.com.

75. Defendants manufacture, advertise, market, distribute and sell the Products throughout the United States, including in Illinois.

### *Defendants' False and Deceptive Advertising and Labeling*

77. In violation of 21 U.S.C. § 362(a) and 21 C.F.R. § 701.1(b), Defendants have consistently, falsely and deceptively advertised and labeled the Products in an effort to make consumers believe that the Products' ingredients, including DMDM hydantoin, were safe for use.

78. Since launching the Products, Defendants have consistently conveyed their uniform, deceptive message to consumers throughout the United States, including the state of Illinois, that the Products formulated with formaldehyde donors, including DMDM hydantoin, are safe for use.

79. These uniform deceptive claims have been made and repeated across a variety of media including Defendants' Products' labels, commercials, websites and online promotional materials, and at the point-of-purchase, where they cannot be missed by consumers.

80. In truth, Defendants' claims that DMDM hydantoin is a safe ingredient is false, misleading, and deceptive because the Products' ingredients, including DMDM hydantoin, were not safe, caused repeated exposure to formaldehyde, and do not safely smooth, nourish, cleanse, and/or repair hair.

81. Upon information and belief, Unilever knowingly permitted the manufacture and sale of Products that were dangerous and unfit for sale as temporary hair "smoothing" Products.

82. Prior to placing the Products into the stream of commerce for sale to Plaintiff and the Class, Defendants were aware or should have been aware that the Products contained one or more unsafe ingredients, including DMDM hydantoin, that caused repeated formaldehyde exposure upon proper application and that any instructions and warnings provided with the Products directly to consumers were materially insufficient.

83. Defendants, including Unilever, knew or but for their reckless indifference would have known, prior to Plaintiff and the Class's purchases of the Products that they would continue to receive complaints of adverse effects of repeated formaldehyde exposure attributed to the Products. Based on their experience and the prior *Suave* litigation, Defendants knew or should have known that even if they diligently investigated the problem, it would be difficult if not impossible to remediate the problem.

84. Defendants, including Unilever knew, or but for their reckless indifference would have known, that: (a) there was an inherent risk of formaldehyde exposure (b) Unilever's customers were unaware of that risk, and (c) those customers had a reasonable expectation that Unilever would not sell the Products under those conditions.

85. Despite such knowledge, Defendants did not disclose to prospective purchasers that proper use of the Products would lead to repeated exposure to formaldehyde. Defendants instead continued to claim that the Products' ingredients, including DMDM hydantoin, were safe, while concealing all the adverse reports filed by consumers.

86. The labels on the back of each Product perpetuate the false, deceptive and misleading representations and claims. Specifically, the back labels of the Products represent the Products would "*gently cleanse" "smooth*", "*moisturize*", "*nourish*", "*control frizz*" and/or

"*reduce hair fall*". (Emphasis Added).

87.    However, despite the representation that the Products "gently" cleanse, they contain (or contained up until recently) one or more harsh ingredients, including DMDM hydantoin, that causes formaldehyde exposure.

88.    Defendants further represent that DMDM hydantoin is safe for use in its products; however, acknowledge that these FRPs are not used in baby care products.[45]

89.    At the time of Plaintiff's and the Class members' purchase of the Products, Defendants had reinforced the false and deceptive claims that the Products "nourish" the hair and leave it in good condition through the websites of various authorized retailers via the products descriptions features.

90.    Defendants intended for consumers to rely upon the representations on the Products' labels, and reasonable consumers, including Plaintiff and the Class, did, in fact, so rely. These representations are often the only source of information consumers can use to make decisions concerning whether to buy and use such products.

91.    Consumers lack the ability to test or independently ascertain the genuineness of product claims of normal everyday consumer products, especially at the point-of-sale. Reasonable customers must therefore rely on consumer product companies, such as Defendants, to honestly represent their Products and the Products' attributes on the Products' labels.

92.    At all relevant times, Defendants directed the above-referenced Products' labels, statements, claims and innuendo, including that the Products "gently" smoothed, cleansed, nourished, and repaired the hair, that the ingredients were safe, to consumers in general and

---

[45] https://www.unilever.com/brands/Our-products-and-ingredients/Your-ingredient-questions-answered/Formaldehyde-donors.html (Last Accessed May 27, 2022).

Plaintiff and all Class Members in particular, as evidenced by their eventual purchases of the Products.

93.     Plaintiff and Class Members did reasonably rely on Defendants' Products' labels, statements, claims and innuendo in deciding to purchase the Products and were thereby deceived.

94.     As a result of Defendants' deceptive labeling and/or marketing campaign, Defendants have caused Plaintiff and putative Class Members to purchase the Products, which contained one or more unsafe ingredients, including DMDM hydantoin, and do not safely smooth, nourish, cleanse, and/or repair hair.

76.     Plaintiffs and Class Members have been harmed economically as they would not have purchased the Products, or would have paid significantly less money for the Products, had they known the Products would lead to repeated formaldehyde exposure.

77.     Importantly, Plaintiffs and Class Members do not seek damages for any physical adverse effects that they experienced from repeated exposure to formaldehyde.  The Plaintiffs and Class Members seek economic damages related to their purchase of the Products without any disclosure by Defendants of the true nature of the Products' ingredients and the inherent risk of repeated exposure to formaldehyde with use of the Products.

95.     As a result of Defendants' misconduct, Defendants were able to sell the Products to at least thousands of consumers throughout the United States— including Plaintiff and putative Class Members—and realized sizeable profits.

96.     Plaintiff and putative Class Members were harmed and suffered actual damages in that Plaintiff and putative Class Members all purchased Products that exposed them to formaldehyde, and therefore, did not receive the benefit of their bargain as purchasers of the Products, which were represented as safe and promoted as being able to safely smooth, nourish,

cleanse, and/or repair hair.

97.     Indeed, Plaintiffs and Class Members did not receive the benefit of their bargain after purchasing the Products, as Plaintiffs and Class Members paid for Products that did not safely smooth, nourish, cleanse, and/or repair hair, but instead caused Plaintiffs and Class Members to be repeatedly exposed to formaldehyde.

98.     Defendants developed and knowingly employed a labeling, advertising and/or marketing strategy designed to deceive consumers into believing that the Products contained safe and "natural" ingredients and could safely smooth, nourish, cleanse, and/or repair hair.

99.     The purpose of Defendants' scheme is to stimulate sales and enhance Defendants' profits.

100.    As the manufacturers, marketers, advertisers, distributors and/or sellers of the Products, Defendants possess specialized knowledge regarding the Products and the content of the ingredients contained therein. In other words, Defendants know exactly what is – and is not – contained in the Products, at what levels, and the potential dangers present at those levels.

101.    Defendants knew or should have known, but failed to disclose, that the Products contain one or more unsafe ingredients, including DMDM hydantoin, and do not safely smooth, nourish, cleanse, and/or repair hair, as labeled and/or marketed by Defendants.

102.    Plaintiff and putative Class Members were, in fact, misled by Defendants' labeling, representations and marketing of the Products.

103.    The unsafe ingredient(s) and the inability of the Products to safely smooth, nourish, cleanse, and/or repair hair, leave no reason to purchase these Products at all, since other proven and safer comparably priced products exist, including Defendant's Suave "Essentials" line of

products.

104. The Products are defined as "cosmetics" under 21 U.S.C.S. § 321(i) of the Federal Food Drug & Cosmetic Act ("FDCA").

105. Defendants' deceptive statements violate 21 U.S.C.S. § 362(a), which deems a cosmetic product misbranded when the label contains a statement that is "false or misleading in any particular."

106. The FDA promulgated regulations for compliance with the FDCA at 21 C.F.R. §§ 701 et seq. (for cosmetics).

107. The introduction of misbranded cosmetics into interstate commerce is prohibited under the FDCA and all parallel state statutes cited in this Complaint.

78. As described in detail below each and every Plaintiff purchased the Products based on Defendants' representations and omissions, and they were damaged in the form of the purchase price or price premium they paid for the Products that unknowingly contained formaldehyde releasing ingredients.

79. Indeed, contrary to Defendants' misrepresentations and omissions, Plaintiffs were not able to safely smooth, nourish, cleanse, and/or repair their hair when using the Products as intended.

108. Also, the Illinois Consumer Fraud and Deceptive Business Practices Act protects Defendants' consumers, and provides:

§ 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or

25

damaged thereby.

815 ILCS 505/2.

109.    Plaintiff and putative Class Members would not have purchased the Products (or would not have paid a price premium for the Products) had they known the Products contained one or more unsafe ingredients and are incapable of safely smoothing, nourishing, cleansing, and/or repairing hair.

## PARTIES

110.    Plaintiff Deanna Lewakowski is and was at all times relevant to this matter a citizen and resident of the state of Illinois, residing in Joliet, Illinois.

111.    Defendant Unilever U.S. is a subsidiary of the dual-listed company consisting of Unilever N.V. in Rotterdam, Netherlands and Unilever PLC in London, United Kingdom. Unilever U.S., which includes the Suave brand, is a Delaware corporation with its principal place of business located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Unilever U.S. manufactured, marketed, designed, promoted and/or distributed the Products.

112.    Defendant Conopco is a New York corporation with its principal place of business located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Upon information and belief, Conopco is responsible for the distribution of the manufactured Products to retailers. At all times relevant hereto, Conopco knew or should have known that the Products would be sold in the United States.

## JURISDICTION AND VENUE

113.    This Court has personal jurisdiction over Defendants in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. Defendants have been afforded due process because they have, at all times relevant to this matter, individually or through their agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried

on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time Defendants were engaged in business activities in the state of Illinois.

114.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Defendants are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

115.    Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avail themselves of the markets in this District, through the promotion, sale, and marketing of the Products in this District. Furthermore, Plaintiff is a citizen of Illinois, and she resides in this District.

## PLAINTIFF LEWAKOWSKI'S FACTUAL ALLEGATIONS

116.    Plaintiff Lewakowski purchased the Products between March and April 2021 from walmart.com multiple times during the class period, including in "multi-packs" that retailed for approximately $2.49 per bottle, and picked the Products up at a Walmart brick and mortar store in Illinois.

117.   Before purchasing the Products, Plaintiff Lewakowski reviewed information about the Products on the Products' labels and the fact that the Products were being sold for personal use, and not resale.

118.   At the time of purchasing her Products, Plaintiff Lewakowski also reviewed the accompanying disclosures, warranties, and marketing materials, and understood them as representations and warranties by Defendants that the Products were safe to smooth, nourish, cleanse, and/or repair hair. Plaintiff Lewakowski relied on these representations and warranties in deciding to purchase Defendants' Products. Accordingly, these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Products had she known these representations were not true.

119.   Here, Plaintiff Lewakowski did not receive the benefit of her bargain because Defendants' Products did not safely smooth, nourish, cleanse, and/or repair Plaintiff's hair.

120.   Indeed, Plaintiff Lewakowski's use of the Products repeatedly exposed her to formaldehyde due to the Products' ingredients, namely DMDM hydantoin.

121.   Plaintiff Lewakowski purchased the Products because she wanted to safely smooth, nourish, cleanse, and/or repair her hair. Before using the Products, Plaintiff Lewakowski followed the instructions on the Products' labels, as directed by Defendants.

122.   After using the Products as intended by Defendants, the Products did not safely smooth, nourish, cleanse, and/or repair Plaintiff's hair. Instead, Plaintiff Lewakowski was repeatedly exposed to formaldehyde.

123.   Plaintiff Lewakowski reasonably expected that the Products she purchased would not cause repeated formaldehyde exposure. Further, Plaintiff Lewakowski reasonably expected

that if Unilever, the company primarily responsible for developing, manufacturing, marketing and distributing the Products, knew that the Products would cause repeated formaldehyde exposure, Unilever would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem.

124.  As the result of Defendants' negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when she paid the purchase price or a price premium for the Products that did not deliver what they promised. Plaintiff paid the purchase price on the reasonable assumptions that the packaging was accurate, the Products were safe to smooth, nourish, cleanse, and/or repair hair.

125.  Plaintiff would not have paid this money had she known that the Products were not safe to smooth, nourish, cleanse, and/or repair hair and/or would repeatedly expose her to formaldehyde.

126.  Plaintiff Lewakowski provided notice to Defendants of her warranty claims, and Defendants had actual notice of the alleged defect and harm caused by the Products.

**ESTOPPEL FROM PLEADING AND**
**TOLLING OF APPLICABLE STATUTES OF LIMITATIONS**

127.  Plaintiff and members of the Classes are within the applicable statute of limitation for the claims presented here. Defendants have knowledge and information detailing the Products' propensity to expose consumers to formaldehyde, but failed to disclose this information to consumers, and Plaintiff and members of the Classes therefore could not reasonably have known that the Products would cause repeated formaldehyde exposure. Rather, consumers relied upon Defendants' misrepresentations and omissions, including the statements on the Products' labeling as set forth above.

128.  Once Plaintiffs discovered the actual nature of the Products and the exposure to

formaldehyde, she promptly acted to preserve her rights, filing this action. Defendants are estopped from asserting any statute of limitation defense that might otherwise be applicable to the claims asserted herein.

## FED. R. CIV. P. 9(b) ALLEGATIONS

129.   Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

130.   **WHO:** Defendants, Unilever U.S. and Conopco, made material misrepresentations and/or omissions of fact in its labeling and marketing of the Products as to demonstrate that they are safe, gentle, and free of harsh ingredients.

131.   **WHAT:** Defendants' conduct here was fraudulent because it has the effect of deceiving consumers into believing that the Products would *safely* smooth, nourish, cleanse, and/or repair hair. Instead, the Products cause repeated formaldehyde exposure when used as intended. Defendants knew or should have known this information is material to the reasonable consumer and impacts the purchasing decision, and yet it omits that the Products have the propensity to expose users to formaldehyde.

132.   **WHEN:** Defendants made material misrepresentations and/or omissions detailed herein continuously throughout the applicable Class periods.

133.   **WHERE:** Defendants' material misrepresentations and/or omissions were made on the labeling and packaging of its Products, which are sold nationwide and are visible to the

consumer on the front of the labeling and packaging of the Products at the point of sale in every transaction.

134. **HOW:** Defendants made written misrepresentations and/or failed to disclose material facts regarding the true risks of normal, intended use of the Products.

135. **WHY:** Defendants engaged in the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs and other reasonable consumers to purchase and/or pay for the Products. Defendants profited by selling the Products to many thousands of consumers.

## CLASS ACTION ALLEGATIONS

136. Plaintiff brings this action on behalf of herself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

> **National Class**: All persons in the United States who purchased the Products
>
> **Consumer Fraud Multi-State Class**: All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Products.[46]
>
> **Illinois Class**: All persons in the State of Illinois who purchased the Products.

137. Excluded from the Classes are (a) any person who purchased the Products for resale

---

[46] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §407.010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

138.    Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

139.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class Members. Moreover, the number of members of the Classes may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

140.    **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are limited to, the following:

   a.    Whether the Products contain the defect alleged herein;

   b.    Whether Defendants failed to appropriately warn Class Members of the formaldehyde exposure inherent in from use of the Products;

   c.    Whether Defendants had actual or imputed knowledge of the defect but did not disclose it to Plaintiff and the Classes;

   d.    Whether Defendants promoted the Products with false and misleading statements of fact and material omissions;

32

    e.   Whether Defendants' marketing, advertising, packaging, labeling, and/or other promotional materials for the Products are deceptive, unfair or misleading;

    f.   Whether Defendants' actions violate the State consumer fraud statutes invoked below;

    g.   Whether Defendants' acts, omissions or misrepresentations of material facts constitute fraud;

    h.   Whether Plaintiff and putative members of the Classes have suffered an ascertainable loss of monies or property or other value as a result of Defendants' acts, omissions or misrepresentations of material facts;

    i.   Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Products;

    j.   Whether Plaintiff and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

    k.   Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

141.    Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the putative Classes, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the putative Classes as a whole. In particular, Defendants have manufactured, marketed, advertised, distributed and sold Products that are deceptively misrepresented as being able to safely smooth, nourish, cleanse, and/or repair hair.

142.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent Class Members in that Plaintiff and the Class Members each purchased and used the Products and each sustained damages arising from Defendants' wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by Defendants' common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' deceptive

misrepresentations regarding the ability of the Products to safely smooth, nourish, cleanse, and/or repair hair, as alleged herein.

143. **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

144. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

145. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and all Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

146. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a. The damages suffered by each individual members of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct;

b. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c. The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d. Individual joinder of all members of the Classes is impracticable;

e. Absent a Class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of Defendants' unlawful conduct; and

f. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by Defendants.

147. In the alternative, the Classes may be certified for the following reasons:

a. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants;

b. Adjudications of claims of the individual members of the Classes against Defendants would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

c. Defendants have acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **Violation Of State Consumer Fraud Acts**
### **(On Behalf Of The Multi-State Class)**

148. Plaintiff re-alleges and incorporates by reference all proceeding factual allegations above as though set forth fully herein.

35

149.    The Consumer Fraud Acts of the States in the Multi-State Class[47] prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

150.    Unilever intended that Plaintiff and each of the other members of the Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

151.    The Products cause repeated formaldehyde exposure when used as intended.  Had this truth been known, Plaintiff and other Multi-State Class Members would not have purchased Unilever's Products or would not have purchased the Products at a price premium.

152.    As a result of Unilever's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Multi-State Class have sustained monetary damages in an amount to be proven at trial.

153.    In addition, Unilever's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT II
### Violation Of The Illinois Consumer Fraud Act
### (In the Alternative to Count I and
### On Behalf of Plaintiff Lewakowski and the Illinois Class)

154.    Plaintiff re-alleges and incorporates by reference all proceeding factual allegations above as though set forth fully herein.

155.    The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq*., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

---

[47] California (Cal. Bus. & Prof. Code §17200, *et seq*.); Florida (Fla. Stat. §501.201, *et seq*.); Illinois (815 Ill. Comp. Stat. 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §445.901, *et seq*.); Minnesota (Minn. Stat. §325F.67, *et seq*.); Missouri (Mo. Rev. Stat. §407.010, *et seq*.); New Jersey (N.J. Stat. §56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §349, *et seq*.); and Washington (Wash. Rev. Code §19.86.010, *et seq*.).

156. Plaintiff and other members of the Illinois Class, as purchasers of the Products, are consumers within the meaning of the ICFA given that Unilever's business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

157. Unilever's conduct in misrepresenting the benefits of its Products constitute the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Unilever's trade or commerce.

158. Unilever also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff and other members of the Illinois Class knowing that consumers would rely on the advertisements and packaging and Unilever's uniform representations to purchase the Products.

159. Once the defect in the Products and its tendency to cause formaldehyde exposure upon proper application (or based upon foreseeable misapplication) became apparent to Unilever, consumers (Plaintiff and other members of the putative Illinois Class) were entitled to disclosure of that fact because exposure to formaldehyde would be a material fact in a consumer's decision-making process, and, without Unilever's disclosure consumers would not necessarily know that there is such a risk.

160. Unilever intended that Plaintiff, and the Illinois Class would rely on the continued deception by purchasing the Products, unaware of the material facts and omissions described above. Unilever knew that its customers would continue to rely on its representations that the Products were safe when used as directed, and knew that consumers would continue to rely upon its silence as to any known risk exposure to formaldehyde as evidence that the Products were safe. This conduct constitutes consumer fraud within the meaning of the ICFA.

161. Unilever's material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of

material facts as to the nature of the goods, in violation of the ICFA.

162.    Plaintiff and the other members of the Illinois Class suffered damages as a proximate result of the unfair acts or practices of Unilever alleged herein. Unilever's misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully or with reckless disregard for the consequences of its actions.

163.    Plaintiff and other members of the Illinois Class would not have purchased the Products but for the promised benefits and concealment of any risk of harm because the Products as sold had no intrinsic value to them

164.    Unilever knowingly accepted the benefits of its deception and improper conduct in the form of profits from the increased sale of the Products.

165.    As a proximate result of the above-described violations of the ICFA, Plaintiff Castillo and other members of the Illinois Class: (a) purchased and used the Products when they would not otherwise have done so; and (b) suffered economic losses consisting of the cost of purchasing the Products.

166.    Unilever's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

167.    Plaintiff also seeks to enjoin Unilever's ongoing deceptive practices relating to their claims on the Products' labels and advertising.

**COUNT III**
**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**ILCS §§ 510/2, et seq.**
**(In the Alternative to Count I and**
**On Behalf of Plaintiff Lewakowski and the Illinois Class)**

168.    Plaintiff Lewakowski repeats and realleges all proceeding factual allegations above as if fully set forth herein.

169. Plaintiff Lewakowski brings this claim on behalf of herself and the Illinois Class for violations of the Illinois Uniform Deceptive Trade Practices Act, ILCS §§ 510/2, et seq.

170. Defendants constitute "persons" as defined by 815 ILCS §§ 510/1(5).

171. Defendants engaged in deceptive trade practices in the conduct of their business, in violation of 815 ILCS §§ 510/2(a), including:

    a. Defendants represented to Plaintiff Lewakowski and the Class that the Products had approval or characteristics that it did not have;

    b. Defendants represented to Plaintiff Lewakowski and the Class that the Products were of a particular standard, quality, or grade when they were actually of another;

    c. Defendants advertised to Plaintiff Lewakowski and the Class goods with intent not to sell them as advertised;

    d. Defendants engaged in other fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding; and

    e. Defendants represented that consumers' purchases of the Products conferred or involved rights that the transactions did not have or involve.

172. As described herein, Defendants repeatedly advertised, both on the Product labels and on its website, through a national advertising campaign, among other items, that the Products were hair "smoothing" Products and that the Products were safe to smooth, nourish, cleanse or repair hair.

173. Contrary to these representations, the Products are not appropriate hair "smoothing" products and are not capable of safely smoothing, nourishing, cleansing, or repairing hair as described on the Product labels or in Defendants' uniform marketing and advertising campaign. Rather, the Products are defective because their inclusion of DMDM hydantoin gives the Products the propensity to cause repeated exposure to formaldehyde, rendering the Products unsafe and

unsuitable for consumer use as marketed by Defendants.

174.     Defendants had exclusive knowledge of material facts concerning the defective nature of the Products, including that proper use of the Products would lead to repeated exposure to formaldehyde.

175.     Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

176.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Lewakowski and Illinois Class members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

177.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Lewakowski and Illinois Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary damages, including from not receiving the benefit of their bargain in purchasing Defendants' Products.

178.     Plaintiff Lewakowski and Illinois Class members seek all monetary relief allowed by law, including reasonable attorney's fees.

## COUNT IV
### Breach of Express Warranty
### (On Behalf of the Nationwide Class)

179.     Plaintiff restates and realleges all proceeding factual allegations above as if fully set forth herein.

180.     Plaintiff brings this claim on behalf of themselves, the Nationwide Class and/or the Illinois Class.

181.     Express warranties by sellers of consumer goods are created when an affirmation

of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain. Such warranties can also be created based upon descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description. See, e.g., 810 ICLS 5/2-313(1)(a)-(b).

182.    Plaintiff, and each member of the Classes, formed a contract with Defendants at the time Plaintiff and the other members of the Classes purchased the Products. The terms of the contract included the promises and affirmations of fact made by Defendants on the Products' packaging and through marketing and advertising, as described herein. This labeling, marketing and advertising constitutes express warranties. Unilever purports through its advertising and packaging to create express warranties that the Products *safely* smooth, nourish, cleanse, and/or repair hair. But after using the Products, the Products did not safely smooth, nourish, cleanse, and/or repair Plaintiff's and Class Members' hair. Instead, the Products caused Plaintiff and Class Members repeated formaldehyde exposure when used as intended.

183.    Defendants' express representations and warranties were made to all consumers, and became part of the basis of bargain between Plaintiffs and the members of the Classes and Defendants.

184.    All conditions precedent to Unilever's liability under this contract were performed by Plaintiff and the Class when they purchased the Products and used them as directed.

185.    Plaintiffs and the members of the Classes purchased the Products through authorized dealers.

186.    Defendants breached express warranties about the Products and their qualities because Defendants' statements about the Products were false and the Products do not conform to Defendants' affirmations and promises as described herein.

187.    Defendants also breached the foregoing express warranties by placing the Products

into the stream of commerce and selling them to consumers when the Products contain harmful chemicals, including DMDM hydantoin. The presence of DMDM hydantoin in the Products rendered them unfit for their intended use and purpose and substantially impaired the use and value of the Products.

188.    Had they known the true nature of the Products, Plaintiff and each of the members of the Classes would not have purchased the Products.

189.    As a result of Defendants' breach of warranty, Plaintiff, and each of the members of the Classes have been damaged in the amount of the purchase price of the Products or by paying a premium price for the Products and any consequential damages resulting from their purchases.

190.    Defendants had actual knowledge of the defect in the Products purchased by Plaintiffs, as well as the Products purchased by other members of the Classes, because: (a) it has knowledge of various studies concluding the nature of the ingredients included in the formulation of the Products; (b) it has knowledge of the complaints made by consumers who purchased the Products; (c) it had knowledge since at least 2012 based on the lawsuit styled *Reid, et al. v. Unilever United States, Inc., et al.*, 1:12-cv-06058 (N.D. Ill.); and (d) was put on notice by a similar case, *Castillo, et al. v. Unilever United States, Inc., et al.*, 1:20-cv-6786 (N.D. Ill.), filed on November 16, 2020 that concerns the same type of defect in a sister line of products.

## COUNT V
### Breach of Implied Warranty of Merchantability
### (On Behalf of the Nationwide Class)

191.    Plaintiff repeats and realleges all proceeding factual allegations above as if fully set forth herein.

192.    Plaintiff brings this claim individually and on behalf of the Nationwide Class and/or the Illinois Class.

193.    The state represented by Plaintiff has adopted UCC § 2-314, which states that "a

warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." See e.g. 810 Ill. Comp. Stat. 5/2-314.

194. At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used, and that products be acceptable in trade for the products' description.

195. Notwithstanding the aforementioned duty, at the time of delivery, the Products sold to Plaintiff were not merchantable because they contained a defect that caused repeated exposure to formaldehyde upon proper application and did not otherwise perform as represented (i.e. safely "smooth," "deeply nourish," "gently cleanse," and "repair hair").

196. Defendants were notified that the Products were not merchantable within a reasonable time after the defect manifested to Plaintiff and the Class.

197. As a result of the non-merchantability of the Products, Plaintiff and the Class sustained damages.

198. Defendants had actual knowledge of the defect in the Products purchased by Plaintiffs, as well as the Products purchased by other members of the Classes, because: (a) it has knowledge of various studies concluding the nature of the ingredients included in the formulation of the Products; (b) it has knowledge of the complaints made by consumers who purchased the Products; (c) it had knowledge since at least 2012 based on the lawsuit styled *Reid, et al. v. Unilever United States, Inc., et al.*, 1:12-cv-06058 (N.D. Ill.); and (d) was put on notice by a similar case, *Castillo, et al. v. Unilever United States, Inc., et al.*, 1:20-cv-6786 (N.D. Ill.), filed on November 16, 2020 that concerns the same type of defect in a sister line of products.

**COUNT VI**
**Fraud**
**(On Behalf of the Nationwide and/or Multi-State Class**
**and/or Illinois Class)**

199.    Plaintiff re-alleges and incorporates by reference all proceeding factual allegations above as though set forth fully herein.

200.    Plaintiff brings this cause of action on behalf of herself, the Nationwide Class and/or Multi-State Class and/or the Illinois Class against Defendants, Unilever U.S. and Conopco.

201.    As alleged herein, Defendants knowingly made material misrepresentations and omissions regarding the Products on the Products' labeling and packaging in the Products' advertisements, and/or on their website.

80.    At all relevant times, Defendants knew, or should have known, that the Products contained ingredients known to cause repeated formaldehyde exposure.

202.    Defendants made material misrepresentations and omissions in order to induce Plaintiff and putative Class Members to purchase the Products.

203.    Rather than inform consumers that the Products contained a defect that caused repeated formaldehyde exposure upon proper application and did not otherwise perform as represented and for the particular purpose for which it was intended, Defendants omitted these material facts and instead claim in marketing materials and their marketing campaign for the Products that the Products would "smooth," "deeply nourish," "gently cleanse," and "repair hair," in order to mislead consumers that the Products have the ability to safely smooth, nourish, cleanse, and/or repair hair.

204.    The inclusion of DMDM hydantoin in the Products causes repeated formaldehyde exposure upon proper application, which renders the Products unable to *safely* smooth, nourish, cleanse, and repair hair.

44

205.    Defendants knew the Products were incapable of safely smoothing, nourishing, cleansing, and/or repairing hair, but nevertheless made such representations and omissions through the marketing, advertising and on the Products' labeling. In reliance on these and other similar misrepresentations and omissions, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Products.

206.    Had Plaintiff and the Class known the truth about the Products, they would not have purchased the Products or would not have paid a premium price for the Products.

207.    As a proximate result of the fraudulent conduct of Defendants, Plaintiff and the putative Class paid monies to Defendants, through their regular retail sales channels, to which Defendants are not entitled, and have been damaged in an amount to be proven at trial.

## COUNT VII
### Unjust Enrichment
### (On Behalf of the Nationwide Class and/or Multi-State Class and/or Illinois Subclass)

208.    Plaintiff re-alleges and incorporates by reference all proceeding factual allegations above as though set forth fully herein.

209.    Plaintiff brings this cause of action on behalf of herself, and the putative Classes against Defendants.

210.    Plaintiff and putative Class Members conferred a benefit on Defendants when they purchased the Products,

211.    By their wrongful acts and omissions described herein, including selling the Products, which contain a defect that caused repeated formaldehyde exposure upon proper application and did not otherwise perform as represented (i.e. safely "smooth," "deeply nourish," "gently cleanse," and "repair hair") and for the particular purpose for which they were intended, Defendants were unjustly enriched at the expense of Plaintiff and putative Class Members.

212.     Plaintiff's detriment and Defendants' enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

213.     Defendants have profited from their unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and putative Class Members under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit. It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Products.

214.     Defendants have been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendants manufactured defective Products, and Unilever misrepresented the nature of the Products, misrepresented their ingredients, and knowingly marketed and promoted dangerous and defective Products, which caused financial injuries to Plaintiff and the Classes because they would not have purchased the Products (or purchased them for much less) based on the same representations if the true facts concerning the Products had been known.

215.     Plaintiff and putative Class Members have been damaged as a direct and proximate result of Defendants' unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the mis-statements regarding what the Products were and what they contained.

216.     Defendants either knew or should have known that payments rendered by Plaintiff and putative Class Members were given and received with the expectation that the Products were able to safely nourish, cleanse, and repair hair as represented by Defendants in advertising, on Defendants' websites, and on the Products' labels and packaging. It is inequitable for Defendants to retain the benefit of payments under these circumstances.

46

217. Plaintiff and putative Class Members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants.

218. When required, Plaintiff and Class Members are in privity with Defendants because Defendants' sale of the Products was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendants' agents for the purpose of the sale of the Products.

219. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, pray for relief and judgment, including entry of an order:

A. Declaring that this action is properly maintained as a class action, certifying the proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B. Directing that Defendants bear the costs of any notice sent to the Class(es);

C. Declaring that Defendants must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Products, or order Defendants to make full restitution to Plaintiff and the members of the Class(es);

D. Awarding Plaintiff and members of the Class(es) statutory damages and treble damages, as provided by the applicable state consumer protection statutes invoked above;

E. Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

F. Awarding civil penalties, prejudgment interest and punitive damages as permitted by law;

G. Ordering a jury trial and damages according to proof; and

H. Ordering such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: May 31, 2022

Respectfully submitted,

*/s/ Jonathan Shub*
Jonathan Shub
Kevin Laukaitis
**SHUB LAW FIRM LLC**
134 Kings Highway E, 2nd Floor
Haddonfield, NJ 08033
T: 856-772-7200
F: 856-210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Andrew J. Sciolla*
**SCIOLLA LAW FIRM LLC**
Land Title Building
100 S. Broad Street, Suite 1910
Philadelphia, PA 19110
T: 267-328-5245
F: 215-972-1545
andrew@sciollalawfirm.com

Melissa K. Sims (IL Bar #6231297)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
111 West Jackson Boulevard
Suite 1700
Chicago, IL 60604
Tel: (815) 878-4674
Msims@milberg.com

Daniel K. Bryson*
Harper T. Segui*
Erin J. Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
dbryson@milberg.com
hsegui@milberg.com
eruben@milberg.com

48

Melissa R. Emert*
Gary S. Graifman*
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
135 Chestnut Ridge Road-Suite 200
Montvale, New Jersey 07645
T: 201-291-7000
F: 201-307-1086
memert@kgglaw.com
ggraifman@kgglaw.com

*_Pro Hac Vice_ Application Filed or Forthcoming

_Attorneys for Plaintiff and Putative Class Members_

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 31, 2022, a true and correct copy of the above and foregoing was filed with the Clerk of Court via the Court's CM/ECF system for electronic service on all counsel of record.

Dated: May 31, 2022    By:  */s/ Jonathan Shub*
               Jonathan Shub